# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DANIEL WILLIAM KAHN,

        Defendant-Appellant.

UNPUBLISHED
May 31, 2016

No. 324320
Cheboygan Circuit Court
LC No. 13-004718-FH

Before: HOEKSTRA, P.J., and METER and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right from his conviction, following a bench trial, of second-degree home invasion, MCL 750.110a(3). Defendant was sentenced to a year in jail, with eight months held in abeyance, and to 18 months' probation. Defendant challenges the admission of a transcript and audio recording of statements he made to police. We reverse defendant's conviction.

Defendant allegedly went into John Lindsay's hunting camp in northern Michigan and took money that Lindsay kept in a freezer. At first, Lindsay told the police that $50,000 was missing, but he later stated that $25,000 was missing.

Cheboygan Sheriff's Detective Lieutenant Timothy Cook and Michigan State Police Detective Sergeant Richard Rule went to the home of Joseph Stoyanovich to question Stoyanovich regarding the theft. They knocked at the front door but no one answered. They returned approximately 1 to 1 ½ hours later and saw that the right garage door was fully open and that there was a car in the driveway. Detective Cook carried a digital recording device that was turned on and recording. Rule and Cook entered the garage through the open door and then knocked on the entry door to the house that was inside the garage. To their surprise, defendant, who was a suspect that they also intended to interview, came to the door.

Defendant was told that he was not under arrest but the detectives asked if they could ask him some questions. Cook then interviewed defendant in the garage for 1 ½ hours and recorded the conversation. Defendant told Cook that he had worked for Lindsay for the previous five years as a caretaker for his property and that he was aware that Lindsay kept cash at the property. Defendant claimed that he was with his friend Tyrone on the day of the alleged break-in. Cook told defendant that, based on cellular telephone tower data, he had evidence that Tyrone had

-1-

traveled north on the day of the alleged break-in. Cook stated, "I'm telling you right now I've got your phone records. I've got Joe [Stoyanovich]'s. I've got Tyrone's. I know how it went down. But you don't need to think you need to save everybody else, alright." Defendant stated, "Joe has nothing to do with anything. . . . And if I need to get an attorney I will because . . . ." Cook then stated, "No, no, I want you to listen to me. . . . I'm here just to give you an opportunity. You know, sh_t happens and we all screw up. And I'll be honest with you[;] in talking . . . with [Lindsay], he doesn't even want his money back. He just wants to know why." Defendant maintained his innocence and Cook continued to encourage him to "play straight up." Cook also reminded defendant that he was an experienced detective, stating, "this isn't my first rodeo." Cook then stated, "If I wanted to be hard about this . . . I would just arrest you. But that's not what I'm here about." Cook then told defendant that Lindsay wanted to hire him back, but that he needed to know why defendant stole the money. Defendant told Cook that he would try to "work something out" with Lindsay. When Cook suggested that Lindsay could garnish defendant's wages, defendant stated, "Well I didn't take fifty thousand from him. I guarantee, I promise you that." Cook then asked, "Okay, what, what was up there then that you took?" Defendant answered, "There was nothing up there." Defendant then asked, "Do I need a lawyer or . . . Cause like I said, there's no proof he had money up there." Cook replied, "You're already telling me you want to work this out."

Defendant then told the detectives that he had been "screwed out of" a large amount of money in a bad investment and that he owed money to other people. Defendant stated, "I need an attorney . . . ." Cook stated, "It's time for you to make up with [Lindsay]." Defendant inquired about whether he was going to be arrested and Cook replied that he was not "going to arrest you here today . . . ." Cook told defendant that defendant needed to be honest and tell Cook what happened. Then, 30 minutes into the interview, defendant acknowledged that he had driven to the property with another person on the day in question and that he took between $5,000 and $10,000. When asked where he found the money, defendant stated that it was in the freezer in an ice cream container. Defendant stated that he entered through an unlocked back window and walked across the property in such a way as to avoid being seen by security cameras.

Defendant moved to suppress his statements to the police on the grounds that his Fourth, Fifth, and Sixth Amendment rights were violated. The trial court denied the motion to suppress. We review de novo a trial court's ruling on a motion to suppress, although factual findings are reviewed for clear error. *People v Williams*, 472 Mich 308, 313, 696 NW2d 636 (2005); *People v Jenkins*, 472 Mich 26, 31, 691 NW2d 759 (2005).

We find this case analogous to *People v Bolduc*, 263 Mich App 430; 688 NW2d 316 (2004). In *Bolduc*, see *id*. at 432, this Court discussed allowable police procedures under the so-called "knock-and-talk" doctrine. In *Bolduc*, *id*. at 433, the defendant allowed the police into his residence. After a conversation, the defendant asked the officers to leave. *Id*. at 433-434. Afterwards, the police questioned the defendant about a bulge in his pocket, and the defendant stated that it was money from having sold a car that day. *Id*. at 434. The defendant offered to take a police officer to a car lot to verify the sale and subsequently did so. *Id*. The defendant eventually admitted to having marijuana and gave the marijuana to the police. *Id*.

This Court noted that a person's Fourth Amendment right to be free from unreasonable seizures can be implicated if a person does not feel free to leave. *Id*. at 436. The Court defined the appropriate test as whether "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id*. at 439 (citations and quotation marks omitted). The Court noted that a reviewing court should look at whether "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id*. at 439 (citation and quotation marks omitted). The Court noted, as examples, that this test applies to encounters taking place on a city street, in an airport lobby, or on a bus. *Id*.

The prosecutor in *Bolduc* argued that

> the district court clearly erred in finding that [the police] questioning of defendant concerning the bulge in his pocket after defendant directed the officers to leave was inherently coercive, and therefore constituted an illegal seizure of defendant's person. [*Id*. at 440.]

This Court disagreed, finding that the police had made an indirect offer of force by not leaving until getting the information they wanted. *Id*. at 442. The Court placed great emphasis on the fact that the questioning occurred in the defendant's home, a place entitled to special protection. *Id*. at 443.

In the present case, defendant rented Stoyanovich's garage as a space to work on cars and at the time he was interviewed, he was repairing a car for his friend. He stated that he had been using the garage since November 2010 and that he had initially paid $100 a month in rent, but had recently lost his job and so was cleaning Stoyanovich's pool and maintaining the grounds in exchange for the use of the garage. Stoyanovich attested that "[defendant] has rented one half of the garage attached to my residence for over two years." Defendant stated that he kept tools and valuable equipment (including a rally car) in the garage. Further, defendant stated that he had initially chosen not to answer the front door, and only answered the knock at the interior garage door out of concern for his property.

The circumstances indicate that the police were on defendant's rented property at the time of the interview. The officers told defendant he was not under arrest, but they also made it clear that they had incriminating telephone records linking him to the crime. At one point Cook told defendant that, if he wanted to, he could arrest him. The detectives applied psychological pressure by offering to help defendant get his job back and offering help with his creditors if he "played straight" with them. In addition, page 26 of the interview transcript reflects that defendant unequivocally stated, "I need an attorney," after previously referring to an attorney two other times. The police replied that defendant needed to "make up with [Lindsay]" and that defendant needed to be honest and tell the police what happened so that he could try to get his job back. From context, it can be inferred that defendant again referred to the need for an attorney when, after beginning his confession, he stated, "I just don't feel comfortable talking about this stuff without—," at which point the police said, "[w]e've already discussed that it happened."

All this amounted to a situation that went beyond a simple "knock and talk." While it is true that there are differences between *Bolduc* and the present case—the present case did not involve a direct request for the police to leave but rather the expression of the need for an attorney, and in the present case defendant was told before the confession that he was not under arrest—these differences are not enough for the case to fall outside the parameters of *Bolduc*. The police, on defendant's rented property, employed coercive interrogation techniques despite the unequivocal expression of the desire for an attorney. A pertinent inquiry is whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id*. at 439 (citation and quotation marks omitted). Given that the police continued with pressurized questioning after an unequivocal request for an attorney, we find that a person in defendant's situation would understand that his requests to terminate the encounter, like in *Bolduc*, were going unheard. Indeed, defendant, by requesting an attorney, was expressing the desire to terminate the encounter, *on his property*, but the police persisted. Accordingly, under *Bolduc*, the incriminating statements resulted from an unconstitutional expansion of a proper "knock-and-talk" procedure.

Because of the Fourth Amendment violation, the trial court erred by not granting defendant's motion to suppress. The trial court's ruling on that motion is reversed, defendant's conviction is vacated, and we remand for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Joel P. Hoekstra
/s/ Patrick M. Meter
/s/ Michael J. Kelly

-4-